Thomas H. WEBB and Beryl R. Webb, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Hartley D. PEAVEY and Melia M. Peavey, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. E81–0101(C), E81–0102(C).

United States District Court, S.D. Mississippi, E.D.

Nov. 23, 1982.

C. Scott Edmundson, Jr., Meridian, Miss., Roland J. Mestayer, Jr., Pascagoula, Miss., for plaintiffs.

George Phillips, U.S. Atty., Jackson, Miss., Jack D. Warren, Tax Division, Dept. of Justice, Washington, D.C., for defendant.

## JUDGMENT

WILLIAM HAROLD COX, District Judge.

These consolidated actions were tried before the Court without the intervention of a jury, and the Court having carefully considered all the evidence of record herein, including the testimony of the witnesses and the documents received in evidence, now makes the following findings and conclusions.

These are civil actions instituted by the plaintiffs for the recovery of income taxes paid for the calendar years 1977 and 1978. The plaintiffs in Civil Action No. E81–0101 seek recovery of $68,901.52, and in Civil Action No. E81–0102 the plaintiffs seek recovery of $63,884.04. The actions were consolidated because they present common issues of fact and law. However, Civil Action No. E81–0101 presents an issue not involved in Civil Action No. E81–0102.

All the procedure prerequisites to the assessment and collection of the amounts sought to be recovered and to the institution of the actions have been complied with or otherwise met.

The common issues of fact and law involved in these cases arise as a result of the disallowance by the Internal Revenue Service of ordinary losses claimed in the plaintiffs' tax returns for 1977 and 1978 with respect to the exchange of promissory notes of Sound Systems, Limited (hereinafter Sound Systems), to that corporation for what is known as Section 1244 stock.

Sound Systems is a Mississippi corporation which was incorporated on February 9, 1976, by plaintiffs, Thomas Webb and Hartley Peavey. It was authorized by its certificate of incorporation to issue only 400 shares of common stock. At the time of incorporation, Webb and Peavey each subscribed to two hundred shares of the corporation's common stock and each paid $20,000 therefor. Thus, the initial capitalization of the corporation was $40,000. The corporation was organized to and did operate a business located in Shreveport, Louisiana, which consisted primarily of selling sound systems, phonograph records and tapes.

Sound Systems filed its tax returns on the basis of a fiscal year ending July 31st. Its first tax return was filed for the short period beginning in February of 1976 and ending July 31, 1976. In the latter return, the corporation reported an operating loss of $62,627.21 for the first six months of its operation.

On March 9, 1977, Webb and Peavey each advanced to Sound Systems $100,000 for which the corporation issued to each a $100,000 promissory note due on September 9, 1977. Both these notes were renewed on September 9, 1977. As renewed, the notes were due on March 9, 1978.

On December 19, 1977, Sound Systems' certificate of incorporation was amended to authorize the corporation to issue 2,000 additional shares of common stock. On the same day, Webb and Peavey each exchanged his $100,000 note for 1,000 shares of such additional stock. Also, on the same day each sold 500 shares of that stock to James R. Faber, the corporation's business manager, for $100. On January 2, 1978, each sold to Faber his remaining 500 shares of that stock with each receiving $100 therefor.

In their tax returns for 1976 and 1978, Webb and Peavey each claimed an ordinary loss deduction of $49,900 as a result of the sale of the stock of Sound Systems, which they acquired on December 19, 1977, and sold to Faber on December 19, 1977, and January 2, 1978. On audit of those returns, however, such losses were denied by the Internal Revenue Service.

The plaintiffs contend that they have complied with all the provisions of Section 1244 of the Internal Revenue Code of 1954 and that under that section they are entitled to the ordinary loss treatment claimed in their 1977 and 1978 tax returns. On the other hand, the defendant contends that the 2,000 shares of stock issued by Sound Systems on December 19, 1977, did not qualify as "Section 1244 stock." In the alternative, the defendant contends that the plaintiffs were not, under Section 1244, entitled to ordinary loss treatment on the exchange of the notes for the stock because (1) the notes exchanged for the stock constituted "stock or securities" and (2) on the date of the exchange, the notes were worthless. In the further alternative, the defendant contends that the amount, if any, by which the fair market value of the stock the plaintiffs sold to Faber exceeded the $400 for which such stock was sold to Faber constituted a contribution to the capital of Sound Systems.

The remaining issue arises only in Civil Action No. E81–0101. It arises as a result of the disallowance by the Internal Revenue Service of a $45,000 deduction claimed in Webb's 1978 tax return for diesel tax paid on a former business. The Internal Revenue Service disallowed the deduction because it determined that the item was not Webb's expense, but that of Webb who contends that he paid the penalty to enhance his own business reputation and position in the business community. The defendant denies that the amount was deductible for the reason stated.

Sound Systems began operations in February 1976 with the $40,000 it had received from Webb and Peavey for its capital stock. According to its first tax return, which was filed for a six month period, the corporation had sustained an operating loss of $62,-627.21 by July 31, 1976. Thus, during its first six months of operation, the corporation had lost all of its original capital plus $22,627.21. During the fiscal year ended July 31, 1977, the corporation sustained an operating loss of $174,645.86, bringing its cumulative operating losses to $237,273.07.

During June and July 1976, Sound Systems borrowed $200,000 from the First United Bank of Mississippi. During the fiscal year ended July 31, 1977, the corporation borrowed the further sum of $85,000 from said bank. Thus, by July 31, 1977, the corporation was indebted to the bank in the amount of $285,000. This indebtedness was all due on or before January 26, 1978. All the money borrowed from the bank was collateralized by the signatures of Webb and Peavey.

On March 9, 1977, Webb and Peavey each advanced $100,000 to Sound Systems. In connection with these advances, the corporation issued a $100,000 promissory note to Webb and a $100,000 promissory note to Peavey. These notes, which provided for interest at the rate of 9% per annum, were due on September 9, 1977, but were unsecured. Such notes were renewed when due and, as renewed, were due on March 9, 1978, with interest at 8½% per annum.

However, no interest was ever paid on said notes.

Stewart, Robertson & Company, certified public accountants, prepared a balance sheet for Sound Systems as of July 31, 1977. On that date, according to that balance sheet, Sound Systems had no equity capital. Its cumulative operating losses ($237,273.07) exceeded its original capital ($40,000) by $197,273.07. It had no working capital; its current assets amounted to $305,087.43 while its current liabilities amounted to $580,273.61—a working capital deficit $275,-186.18. Included in the current liabilities was $485,000, consisting of $285,000 due the First United Bank of Mississippi and the $200,000 for which the promissory notes previously referred to were issued to Webb and Peavey. According to the balance sheet indicated, all of the $450,000 was due within six months and very substantial portions thereof were due in each of the ensuing months of September through January.

On September 12, 1977, the board of directors of Sound Systems directed that the $285,000 owed to the bank be put on a 48 month payout note.

A balance sheet for the period of August 1 through November 1977 was prepared for Sound Systems which indicates that the corporation earned income of $25,660.35 during the four month period covered by it. This income figure is unreliable, however, because no provisions were made in it for current depreciation (the accumulated depreciation shown on the balance sheet is the same as that shown on the tax return balance sheet at July 31, 1977) and $12,593.21 accounts receivable is shown as a current asset notwithstanding the amount had been previously paid with checks, issued on insufficient funds, which were not paid and had to be returned.

Prior to December 2, 1977, Sound Systems, through one of its shareholders, Peavey, received advice from tax counsel that a tax savings could be obtained by its shareholders through the issuance of Section 1244 stock. On December 2, 1977, the board of directors and shareholders of the corporation approved a resolution to amend the corporation's certificate of incorporation to provide for the issuance of an additional two thousand shares of common stock. Such an amendment was made on December 19, 1977, and on that date, the board adopted a further resolution calling for the issuance of two thousand shares of stock in such manner that the purchasers could receive the benefits of Section 1244 of the Internal Revenue Code of 1954. The board's minutes indicate that Webb and Peavey each offered to purchase 1,000 shares of such stock by cancelling the $100,-000 note previously issued to him by the corporation. These offers were accepted. On the same day, Webb and Peavey each sold 500 shares of that stock to James R. Faber for $100. On January 2, 1978, Webb and Peavey each sold his remaining 500 shares of such stock to Faber, again with each receiving $100 therefor.

By letter dated December 16, 1977, the First United Bank of Mississippi indicated that it would loan Sound Systems $285,000 to be repaid in forty, rather than 48, monthly installments. This sum was not actually loaned to the corporation, but rather the corporation's indebtedness to the bank, evidenced by several notes, was consolidated into one note, due in monthly installments of $7,000 plus interest. The new consolidated note was issued to the bank on December 19, 1977, and Webb and Peavey each guaranteed repayment of one-half of the corporation's indebtedness to the bank.

As heretofore noted, Webb and Peavey each claimed deductible ordinary losses of $49,900 in their tax returns for each of the years 1977 and 1978. These deductions were claimed on the grounds that by exchanging their $100,000 notes to Sound Systems for 1,000 shares of its Section 1244 stock, they each acquired a tax basis in such stock of $100,000 and that when each sold one-half of that stock to Faber on December 19, 1977, and January 2, 1978, for $100, each sustained a loss in each of those years in the amount by which his basis in the shares sold ($50,000) exceeded the amount received for them ($100), or $49,900.

By July 31, 1977, the cumulative operating losses of Sound Systems exceeded its original capital by $197,273.07 and there existed a deficit in its working capital of $275,186.18. On December 19, 1977, the certificate of incorporation was amended to authorize the issuance of 2,000 shares of stock so issued as to provide Webb and Peavey, the purchasers of that stock, with the benefits of Section 1244 stock, i.e. ordinary loss treatment on its sale. Webb and Peavey acquired the stock by cancelling their $100,000 notes and sold one-half of such stock immediately (December 19, 1977) and the remaining half of it a very short time thereafter (January 2, 1978). Thus, the Court finds that the $100,000 notes were not cancelled for the purpose of making an investment in the corporation, but rather to obtain stock which could be sold and tax benefits achieved on such sale. This finding is supported by the fact that the stock was sold for only $400, that such stock constituted 83% of the corporation's outstanding stock and that the sale gave the purchaser majority control of the corporation. The purpose for making an investment in a corporation is to obtain a return on that investment by sharing in the income earned by the corporation or through the sale of rights in the investment after it has appreciated in value. Neither of these ends motivated the cancellation of the $100,000 notes involved in this case.

However, even if the cancellation of the $100,000 notes for stock in the corporation did constitute an investment, such notes were originally issued on March 9, 1977, in return for advances of equity capital and constituted "stock or securities" of the corporation. At the time the notes were issued, there was a deficit in the corporation's capital account of $197,273.07 and the corporation had a deficit in working capital of $275,186.18. The corporation never paid any of the principal of the note or interest thereon. The notes were unsecured and repayment was at the risk of the business. Enforcement of the notes would have required liquidation of the corporation. The owners of the notes participated in the management of the corporation; they were shareholders of the corporation. Because the shareholders had co-signed $200,000 of the notes the corporation had issued for bank loans, repayment of the $200,000 in notes issued to them were, in effect, subordinated to payment of the bank's notes. At the time, the $100,000 notes were issued, the corporation was less than thinly capitalized; its capital was non-existent. The $100,000 advanced by Webb and Peavey for the notes, were proportional to their stock ownership; each was a 50% owner of the corporation's stock and they made equal advances. There is no indication that the corporation could have obtained a loan of the $200,000 advanced to it by its shareholders from outside sources; the corporation was deficit-ridden and the bank loans it obtained were collateralized by shareholder signatures. Repayment of the notes and any interest payments thereon were contingent upon the corporation's earnings.

The competent evidence of record shows that on December 19, 1977, when Webb and Peavey exchanged their $100,000 notes to the corporation for 2,000 shares of the corporation's common stock, such notes were worthless. Both Ken Watkins and Michael Fontan, who were qualified to testify as experts at the trial, testified that the notes had no fair market value. Watkins is a certified public accountant with nine years of experience in the area of income taxation and is currently a tax manager in a local accounting firm. He testified that the notes lacked value because they were unsecured and not due for sometime, the corporation was in a deficit financial position and had not proved itself financially and the notes were exchanged for 83% of the corporation's stock and such stock was sold almost immediately for only $400. Fontan is a former Vice President, Senior Commercial Lending Officer, Branch Administrator and member of the Board of Directors of the Rankin County Bank, with 28 years of commercial banking experience. He has had prior experience in determining the fair market value of promissory notes. He purchased and sold securities for the bank. His testimony that the notes in question had no

fair market value was based on his study of the financial history of the corporation, the losses the corporation had sustained, the fact that the notes were unsecured, such notes were not due until sometime in the future, a purchaser of the notes would have no voice in the management of the corporation's affairs and existing management could take adverse action toward repayment of the notes before repayment was due thereon. He did not take into account the liquidation value of the corporation as of the valuation date, December 19, 1977. There were no plans to liquidate the corporation at that time and a purchaser of the notes could not have compelled one at that time; the notes were not due until March 9, 1978.

During the discovery period in these cases, the defendant served interrogatories on the plaintiffs asking for the names of all experts whom they expect to call to testify at the trial. In their answers, the plaintiffs named two experts. However, neither was called. The only testimony offered by the plaintiffs on the question of the fair market value of the $100,000 promissory notes issued to Webb and Peavey was the self-serving testimony of Peavey. He testified that "in his mind" the fair market value of the notes was their face value. However, he gave no basis for his views as an owner.

The Court finds, based on the testimony of Watkins and Fontan, that the two $100,000 notes which Webb and Peavey exchanged for two thousand shares of the common stock of Sound Systems on December 19, 1977, were worthless on that date.

To the extent, if any, that the fair market value of the Sound Systems stock Webb and Peavey sold to Faber on December 19, 1977, and January 2, 1978, exceeded the $400 they received for such stock, they made a contribution to the capital of Sound Systems. Such stock was sold to Faber as an inducement to him to remain in the employment of the corporation and to continue to render his managerial skills on behalf of the corporation.

In 1973, Webb was the owner of all the capital stock in a corporation known as Mid-State Paving Company. During that year, he sold that stock to four employees of the corporation. At the time of the sale of the stock, a controversy existed between the corporation and the Mississippi Motor Vehicle Comptroller concerning the liability of the corporation for tax on diesel fuel used in making asphalt and a failure-to-pay penalty of approximately $45,000. The controversy as to the tax was litigated and it was determined that the corporation was liable for the tax. Thereafter, in subsequent litigation brought in 1978 to determine the application of the penalty, it was ruled that because the issue as to the penalty could have been raised in the prior litigation relating to the tax liability, the subsequent litigation on the penalty was barred by the principles of res judicata. In all events, Mid-State Paving Company paid the tax and Webb paid the penalty. Webb testified that he paid the penalty to protect his reputation. He admitted, however, that he was not personally required to pay the penalty and that the payment he made was not made in effort to earn income, or in connection with property which he was holding for the production of income. He agreed that if the penalty he paid was owed, it was a penalty imposed against Mid-State Paving Company. Webb was not engaged in such business at the time he paid the penalty. After he sold the stock of Mid-State Paving Company in 1973, he retired. It was not until 1979 that he became bored with retirement and went back into business.

The Court finds that the penalty Webb paid was not his expense, but that of Mid-State Paving Company. Moreover, Webb has failed to establish that such payment was an ordinary and necessary expense paid or incurred during 1978 for the production or collection of income, for the management, conservation or maintenance of property held for the production of income or in connection with the determination collection, or refund of any tax.

The Court has jurisdiction of these actions pursuant to 28 U.S.C. § 1346(a)(1).

■ Inasmuch as the Internal Revenue Service determined that the plaintiffs owed the taxes which they seek to recover herein, such determination "has the support of a presumption of correctness and the (plaintiffs have) the burden of proving it to be wrong." *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212. "The presumption is that taxes are rightly collected upon assessments correctly made by the Internal Revenue Service, and in a suit to recover them the burden rests upon the taxpayer to prove all facts necessary to establish the illegality of the collection." *Niles-Bement Pond Co. v. United States,* 281 U.S. 357, 50 S.Ct. 251, 74 L.Ed. 901. "The burden of proof goes so far as to demand not only that the taxpayer show that the deficiency assessed against him is wrong, but what is the proper deficiency, or that there should be none at all." *Taylor v. Commissioner,* (2CA) 70 F.2d 619.

Section 1244 of the Internal Revenue Code of 1954 (26 U.S.C. § 1244) provides that a loss on "Section 1244 stock" issued to an individual shall be treated as an ordinary loss, subject to certain limitations. "Section 1244 stock" is defined in Section 1244(c) to mean, as applicable herein, common stock of a domestic small business corporation if (1) such corporation adopted a plan to offer such stock for a limited period when no part of a prior offering was outstanding, (2) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock or securities), and (3) such corporation in prior years derived more than 50% of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities and sales and exchanges of stock or securities. The amount of the ordinary loss allowable on Section 1244 stock is limited by virtue of the adjustment to the basis of the stock required by Section 1244(d)(1). Under the provisions of Section 1244(d)(1), where section 1244 stock is issued in exchange for property, the basis in the property is carried over to the stock, but in computing the loss on the stock its carried over basis is reduced by the amount by which the adjusted basis in the property immediately before the exchange exceeded its fair market value at such time.

■ With respect to the stock the plaintiffs acquired from Sound Systems on December 19, 1977, four questions are presented:

a. Whether stock issued by Sound Systems failed to qualify as "Section 1244 stock" so that the plaintiffs realized no ordinary losses upon disposition of that stock.

b. Whether two $100,000 notes received by the plaintiffs on March 9, 1977, from Sound Systems, constituted "stock or securities."

c. What was the fair market value of each of two $100,000 notes on December 19, 1977, when they were cancelled in exchange for stock of Sound Systems.

d. Whether the amount, if any, by which the fair market value of the stock sold to Faber exceeded the $400 for which such stock was sold to Faber constituted a contribution to the capital of Sound Systems.

Section 1244, according to its legislative history, was intended to encourage investment in small business enterprises. Where there has been no such investment, but rather the use of a corporation solely to obtain tax benefits for shareholders through the issuance and sale of its stock, as here, no ordinary loss treatment is to be allowed even though the procedures adopted and the transactions carried out by the parties meet the technical requirements of Section 1244 in a literal sense. Thus, the Court holds that the stock issued by Sound Systems on December 19, 1977, failed to qualify as "Section 1244 stock" and the plaintiffs realized no ordinary losses upon disposition of that stock. *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; *Morgan v. Commissioner,* 46 T.C. 878; *Hill v. Commissioner,* 51 T.C. 621; *Scott v. Commissioner,* T.C.M. 1968–148.

In view of the Court's findings of fact, the stock issued by Sound Systems on December 19, 1977, does not qualify as Section 1244 stock because it was issued for "stock

or securities." *Smyers v. Commissioner,* 57 T.C. 189; *Oppenheim v. Commissioner,* T.C. Memo. 1973–10; *Slappey Drive Industrial Park v. United States,* (5CA) 561 F.2d 572; *United States v. Snyder Brothers Company,* (5CA) 367 F.2d 980, cert. denied 386 U.S. 956, 87 S.Ct. 1021, 18 L.Ed.2d 104; *Tyler v. Tomlinson,* (5CA) 414 F.2d 844; *Berkowitz v. United States,* (5CA) 411 F.2d 818; *Estate of Mixon v. United States,* (5CA) 464 F.2d 394. Stock which is issued for "stock and securities" is by definition not section 1244 stock. Section 1244(c)(1)(D) of the Internal Revenue Code of 1954 (26 U.S.C. § 1244(c)(1)(D)). Thus, for this reason, the plaintiffs herein are not entitled to ordinary loss treatment on the disposition of the stock they acquired from Sound Systems on December 19, 1977.

■ Because the plaintiffs failed to produce competent evidence of the fair market value of the $100,000 notes they have failed to meet their burden of proof that they realize a loss on the stock on their sale of it to Faber on December 19, 1977 and January 2, 1978. *Shapiro v. Commissioner,* T.C. Memo. 1966–28.

Section 1244(d)(1)(A) of the Internal Revenue Code of 1954 limits the amount of loss on Section 1244 stock by reducing the basis in such stock to the fair market value of the property which was exchanged to acquire such stock. Here, the stock acquired by the plaintiffs from Sound Systems on December 19, 1977, was acquired for two $100,000 notes which the Court has found as a fact were worthless immediately before the exchange. Hence, upon the sale of such stock to Faber, the plaintiffs realized no loss because their basis in the stock did not exceed the amount they received for it.

Since the stock the plaintiffs sold to Faber was sold to him as an inducement to remain in the employment of Sound Systems and to continue to render his managerial skills on behalf of the corporation, to the extent, if any, that the fair market value of that stock exceeded the amount they received for it, they made a contribution to the capital of Sound Systems. Sec-

tion 83 of the Internal Revenue Code of 1954; *Schleppy v. Commissioner,* (5CA) 601 F.2d 196; *Deputy v. DuPont,* 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416; *Interstate Transit Lines v. Commissioner,* 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607; see also dissent (Judge Scott) in *Tilford v. Commissioner,* 75 T.C. 134, 152, appeal docketed No. 81–1447, (6CA).

■ While plaintiff Webb urges that the $45,000 liability of Mid-State Paving Company which he paid and seeks to deduct in his personal tax return for 1978 is deductible under either Section 162 or 212 of the Internal Revenue Code of 1954 (26 U.S.C. § 162 or 212), it is clear that he is not entitled to deduct the payment under either of those sections. To be entitled to deduct it under Section 162, it would have had to have been paid as an ordinary and necessary expense incurred during that year in carrying on a trade or business. Since the evidence shows and the Court has found that Webb was in retirement at the time the payment was made, he did not make the payment incident to a trade or business he was carrying on. It is, therefore, not deductible under Section 162. While Section 212 authorizes deduction for certain expenses, not incurred in a trade or business, such deductions are restricted to ordinary and necessary expenses paid or incurred during the taxable year for production or collection of income, for management, conservation or maintenance of property held for the production of income or in connection with the determination, collection or refund of any tax. Since Webb has admitted that the payment was not made in an effort to earn income or in connection with property which he was holding for the production, he is not entitled to deduct the payment under Section 212, unless it can be said to have been made in connection with the determination, collection, or refund of any tax. However, to be deductible for the latter reason, the tax in question must have been Webb's tax. Treasury Regulations on Income Tax (1954 Code), Section 1.212–1(*l*).

Accordingly, since Webb has admitted that the liability he paid was that of Mid-State Paving Company and that he was not required to pay it, it was not his tax and he is not entitled to deduct it under Section 212. While there have been cases in which deductions have been allowed for payments of corporate obligations by individuals, the test of integrality was applied, i.e., whether the payment in question bore a direct and close relationship between the individual making the payment and the individual's business. The evidence here does not show that the payment made by Webb was integral to any business of his. He has, therefore, failed to show that he is entitled to the deduction he claims. *Allen v. Commissioner,* (7CA) 283 F.2d 785.

In conclusion, it is the judgment of this Court that the consolidated plaintiffs have not established their respective claims to this Court by a preponderance of the evidence. The Court finds as a fact that the plaintiffs have not established their respective claims by a preponderance of the evidence, and concludes as a matter of law that Thomas H. Webb and Beryl R. Webb, and Hartley D. Peavey and Melia M. Peavey have not established their claims by a preponderance of the evidence and that the consolidated complaints of said plaintiffs are without merit and should be and are hereby dismissed with prejudice. Said plaintiffs are assessed with all costs of this suit to be taxed by the Clerk of this Court under its rules and for the recovery of which proper process may issue.