T.C. Memo. 1997-326

UNITED STATES TAX COURT


TIMOTHY L. AND JANE WILLIAMS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 557-95.                    Filed July 16, 1997.


Timothy L. Williams, pro se.

<u>Julie M.T. Foster</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax and accuracy-related penalties
for substantial understatements of income tax as follows:[1]

_____

   [1] Unless otherwise indicated, section references are to the
Internal Revenue Code in effect for the years in issue.  All Rule
references are to the Tax Court Rules of Practice and Procedure.

|       |            | Penalty              |
| Year  | Deficiency | Sec. 6662(a) and (d) |
|-------|------------|----------------------|
| 1991  | $4,024     | - 0 -                |
| 1992  | 14,645     | $2,929               |
| 1993  | 8,013      | 1,603                |

All references to petitioner are to Timothy L. Williams. All numbers are rounded to the nearest dollar. After concessions,[2] the issue for decision is whether petitioners are entitled to deduct losses attributable to certain S corporations in excess of the amounts allowed by respondent. Disposition of this issue turns on the amount of petitioner's basis in his stock

_____

[2] The deficiencies and penalties reflect, in part, adjustments for unreported income. At trial and on brief petitioners specifically contested only the adjustments relating to disallowance of S corporation losses. All uncontested adjustments and liability for accuracy-related penalties with respect to any substantial understatements of tax are deemed to be conceded. Rule 149(b); Murphy v. Commissioner, 103 T.C. 111, 119 (1994); Rothstein v. Commissioner, 90 T.C. 488, 497 (1988).

Petitioners in their petition raised an issue relating to their tax liability for a year not covered by the notice of deficiency. They alleged that, owing to a return preparer's error, a net loss incurred for 1989 by petitioner's wholly owned S corporation was not claimed on petitioners' tax return for that year. Petitioners subsequently filed a claim for refund of $12,988, which the Internal Revenue Service denied by letter dated April 22, 1993. With respect to this issue, we can only observe that the jurisdiction of this Court to redetermine petitioners' correct tax liability is limited to the years covered by the notice of deficiency, 1991 through 1993. Sec. 6214(b). Petitioners did not claim an NOL carryover from 1989 on their returns for any of the years in issue, and they have not shown that they would be entitled to carry forward any NOL that may have arisen in 1989 without first carrying it back to the preceding 3 years. Sec. 172(b)(2) and (3). Consequently, the alleged overpayment of tax for 1989 has no relevance to the issues that are properly before us. Cf. Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440-442 (1974), affd. without published opinion 510 F.2d 970 (3d Cir. 1975).

in and loans to the S corporations and the extent, if any, to which petitioner recognized income upon the acquisition by one of these corporations of assets from the other.

FINDINGS OF FACT

Some of the facts have been stipulated, and are so found. The stipulations of fact and attached exhibits are incorporated by this reference. At the time the petition was filed, petitioners resided in Columbia, South Carolina.

In 1987 petitioner founded Williams Investigative & Security Services, Inc. (WIS). Petitioner was the operator and sole shareholder of WIS throughout its existence. WIS was primarily engaged in the business of insurance investigations; it also provided security services.

Throughout 1990 WIS was in a dispute with a client over a major security services contract. The client unilaterally cut back the amount of services required, then terminated the contract prematurely and disavowed representations it had made to WIS concerning future work engagements. At the end of the year, WIS filed suit for fraud, breach of contract and promissory estoppel, seeking recovery of compensatory and punitive damages arising from the loss of the contract and the valuable engagements. See Kemira, Inc. v. Williams Investigative & Sec. Serv., Inc., 450 S.E.2d 427 (Ga. Ct. App. 1994).

As WIS's financial situation deteriorated, it was compelled to borrow. Third-party loans were not sufficient, however, to

keep WIS afloat.  During 1990 petitioner provided additional capital, both through contributions and loans.  In January 1990 petitioner made two deposits totaling $29,000 into the WIS payroll account maintained at the Citizens & Southern National Bank.  On February 28, petitioner executed a promissory note and security agreement in favor of Navy Federal Credit Union in exchange for a personal loan of $14,000.  He then deposited the loan proceeds into the WIS account at Palmetto Federal.  The deposit slip identifies the amount deposited as "Loan".  On March 1 petitioner entered into a sale-leaseback agreement with Palmetto Rental & Leasing, Inc. (PR&L), with respect to five motor vehicles.  PR&L purchased the vehicles and agreed to lease them to WIS for a stated term.  All proceeds of the sale were deposited into WIS's account at Palmetto Federal on March 5.  The proceeds attributable to each vehicle were as follow:

| | |
|---|---|
| Ford Aerostar | $3,330 |
| Toyota Pickup | 2,050 |
| Toyota Pickup | 4,800 |
| Toyota Cressida | 4,000 |
| Ford Bronco | 8,000 |
| | 22,180 |

For each vehicle except the Ford Aerostar, an Affidavit & Notification of Sale of Motor Vehicle identifies the seller as either petitioner alone or petitioners jointly.  In the case of the Ford Aerostar, the seller is listed as "WMS Invest Sec & T. Williams".  In each case the seller(s) correspond to the owner(s) identified on the vehicle's Certificate of Title.

On January 5, February 5, and May 30, 1990, petitioner used his personal credit cards to obtain cash advances on WIS's behalf totaling $19,500. On August 24, petitioner deposited a personal check in the amount of $15,000 into WIS's account at Palmetto Federal. The deposit slip identifies the amount as "Loan".

At some point in 1991, WIS filed a petition for reorganization under chapter 11 of the Bankruptcy Code. Petitioner continued to operate the corporation in bankruptcy while it endeavored to pay its debts. By the end of the year petitioner had formulated a plan of reorganization (the business reincorporation transaction). The insurance investigation business would be continued through a newly formed entity called Southeast Professional Services, Inc. (SPS), and the security services business discontinued. WIS would transfer assets to SPS to provide the new company's initial capital and would also lease to SPS its equipment and furniture. As an inducement to help him manage the business, petitioner would share ownership of SPS with two associates named Lewis and Tate. Each would hold an equal one-third share of SPS's newly issued stock, but only petitioner among the three holders would be responsible for an initial contribution of property, which would be supplied by WIS.[3]

---

[3] Petitioner's uncorroborated testimony is the source of most of the evidence in the record concerning the terms of the business reincorporation transaction outlined above. Under the Bankruptcy Code, in general any transfer of an interest in property of the bankruptcy estate after the filing of the

(continued...)

SPS was organized on December 31, 1991. Its opening balance sheet as of that date shows current assets of $23,509, consisting of $5,000 in cash and $18,509 in accounts receivable. Deposit slips show three separate deposits in the total amount of $5,000 were made into SPS's account at NCNB National Bank during December 1991. Two of these deposits are traceable to a check for $3,000 drawn on WIS's account. Transfer of the accounts receivable reflected on SPS's opening balance sheet is substantially confirmed by payments made to SPS on these accounts in the total amount of $17,911 in January and February 1992. The parties have stipulated that WIS transferred additional accounts receivable to SPS in 1992. These receivables represent work for which WIS issued invoices during January 1992. Although the stipulated amount of the receivables transferred in 1992 is $8,141, comparison of the invoices evidencing these additional

---

[3](...continued)
petition is voidable unless authorized by the bankruptcy court or by some provision of the Bankruptcy Code. 11 U.S.C. sec. 549 (1988). Any plan for the rehabilitation of the debtor must be submitted to the creditors for approval and confirmed by the bankruptcy court. 11 U.S.C. secs. 1125, 1126, 1128, 1129 (1988). It is not entirely clear from petitioner's testimony what would have persuaded the bankruptcy court and WIS's creditors that WIS's transfer of property to another corporation partly owned by its sole shareholder served the creditors' interests. However, inasmuch as respondent did not challenge the plausibility of petitioner's account of the business reincorporation transaction on this ground, there is no evidence contradicting his account, and the tax consequences of his account are not necessarily more favorable to him than other conceivable explanations of the few facts relating to the transaction for which documentation exists, we accept petitioner's account.

receivables with the checks evidencing the initial $18,509 of receivables reveals an overlap of $1,003. Accordingly, a total of $7,138 of accounts receivable was transferred by WIS to SPS at the beginning of 1992.

There is no evidence that any liabilities of WIS to petitioner or third-party creditors were assumed by SPS or otherwise satisfied or discharged as part of the business reincorporation transaction. There is no evidence that Lewis and Tate received their stock in SPS in exchange for any contribution of property or preincorporation services on SPS's behalf. Nor is any indebtedness of the corporation to a shareholder or of a shareholder to the corporation reflected on SPS's opening balance sheet.

The record contains no direct evidence establishing when petitioner actually received his stock in SPS. If SPS issued its stock in December 1991 before receiving full payment of the consideration, then the unpaid balance would presumably have appeared as an asset on the corporate balance sheet as of December 31, 1991. The absence of any such entry suggests that the stock was more likely issued when fully paid, following the transfer of the $7,138 of additional receivables at the beginning of 1992.

Following the aforesaid transfers of property, WIS ceased active business but remained in existence to collect rental income from the lease of its fixed assets and any damages that it

might be awarded in the lawsuit filed in 1990 (presumably for the benefit of its creditors). The WIS chapter 11 proceedings concluded in 1992. Petitioner's attempt to revive the insurance investigation business through SPS was short lived. Lewis and Tate left the venture in 1992 and 1993, respectively, and SPS ceased business in 1994.

For all relevant years, WIS and SPS qualified as S corporations within the meaning of section 1361(a)(1). It appears that WIS had no accumulated earnings and profits from prior years in which it may have been a C corporation. Each corporation maintained its books and records and filed its returns using the cash method of accounting. In the absence of any evidence to the contrary, we assume that each corporation computed its income on the basis of a calendar year. See sec. 1378.

On their joint Federal income tax return for 1991, petitioners reported income attributable to WIS in the amount of $1,541. They also claimed a deduction for "other losses" in the amount of $136,748, which petitioners claim is attributable to WIS. The computation of the loss was disclosed in an attachment to the return. The attachment purports to be a balance sheet for WIS as of December 31, 1991, prepared for purposes of the chapter 11 reorganization. The balance sheet lists corporate assets, "pre-petition liabilities" and "post-petition liabilities", and reflects a deficit in shareholder's equity of $136,748.

On their joint Federal income tax return for 1992, petitioners reported income attributable to WIS in the amount of $6,777 and a loss attributable to SPS in the amount of $40,560. They also claimed a $129,972 deduction for "other losses". The copy of petitioners' return for 1992 that was submitted in evidence does not disclose how the "other losses" were computed. It appears, however, that this figure simply represents the $136,748 deficit in shareholder's equity of WIS reported for 1991 reduced by $6,777 of income earned by WIS in 1992.

On their joint Federal income tax return for 1993, petitioners reported a $36,464 loss attributable to SPS.

The notice of deficiency explained respondent's determination regarding the losses claimed from WIS for 1991 and 1992 as follows:

> 1.e.  The deductions of $136,748.00 and $129,972.00 shown on your returns for the respective taxable years ended December 31, 1991, and 1992, as "other losses" are not allowable because no basis in fact for such "other losses" exists (See explanation 1.f.).  * * *
>
> 1.f.  S corporation losses are limited by section 1366 of the Internal Revenue Code to the extent of your basis in stock in the S corporation and your adjusted basis of any indebtedness of the S corporation to you. Accordingly, it is determined that losses in the amounts of $136,748.00 and $129,972.00[4] from Williams Investigative and Security Services, Inc., are allowable only to the extent of $12,331.00 for the taxable year ended December 31, 1991.  * * *

---

[4] At trial and on brief, respondent's counsel mistakenly treated this amount as attributable to SPS.

Respondent computed the basis of petitioner's investment in WIS
and the allowable loss for 1991 as follows:

Contributions or loans, 1990
|  |  |
| --- | --- |
| Personal credit card advances | $19,500 |
| Proceeds of personal loan | 14,000 |
| Check drawn on own account | 15,000 |
| Own funds | 29,000 |
| Basis in WIS, 1990 | 77,500 |
| Loss claimed from WIS, 1990 | 65,169 |
| Basis in WIS, 1991 | 12,331 |
| Allowable portion of loss claimed from WIS, 1991 | 12,331 |
| Basis in WIS, 1992 | - 0 - |
| Allowable portion of loss claimed from WIS, 1992 | - 0 - |

The record does not disclose why, after concluding that
there was "no basis in fact" for claiming a loss that represented
a deficit in shareholder's equity, respondent nevertheless
allowed $12,331 of that loss.  At trial, respondent's counsel
conceded that the pass-through loss from WIS for 1991 was
allowable in excess of $12,331 to the extent that petitioners
could document any additional adjusted basis of petitioner's
investment in WIS.

With respect to SPS losses of $40,560 and $36,464 claimed as
deductions on petitioners' returns for 1992 and 1993, respondent
determined that $879 was allowable for 1992, and no amount was
allowable for 1993.  The notice of deficiency does not identify
the source of the $879 of stock or loan basis implied by
respondent's determination for 1992, and respondent did not offer
clarification at any time in these proceedings.  At trial, the

Court deemed respondent to have conceded any grounds for disallowance of the deductions claimed for SPS losses other than the limitation of the deductions to the extent of petitioner's stock and loan bases in SPS.

ULTIMATE FINDINGS OF FACT

The combined total of the adjusted bases of petitioner's stock in WIS and of WIS's indebtedness to petitioner was $32,846 for 1991, before taking account of pass-through losses for the year, and zero for 1992. The adjusted basis of petitioner's stock in SPS was $31,526 for 1992, before taking account of pass-through losses for the year, and zero for 1993. Petitioner recognized additional income in the business reincorporation transaction in the amount of $30,647 for 1992.

OPINION

1. Petitioner's Basis in WIS

In general an S corporation is not subject to Federal income tax. Sec. 1363(a). The S corporation's items of income, loss, deduction, and credit for the taxable year are taken into account currently by the shareholders on their individual returns. Sec. 1366(a). The aggregate amount of corporate losses and deductions taken into account by a shareholder cannot exceed the sum of the adjusted bases of the shareholder's stock in the S corporation and the indebtedness of the S corporation to the shareholder. Sec. 1366(d)(1).

The parties dispute the cumulative amount of petitioner's contributions and loans to WIS through the end of the taxable year 1991. In computing petitioner's basis in WIS for 1991, respondent gave petitioner credit for contributions and loans during 1990 in the total amount of $77,500. Petitioners bear the burden of proving that petitioner's investment in WIS exceeded the amount determined by respondent. Rule 142(a).

The evidence indicates that in 1990, in addition to the amounts allowed by respondent, petitioner contributed to WIS the proceeds realized from the sale of personally owned vehicles to PR&L. Of the five vehicles sold, one, the Ford Aerostar, was owned in part by WIS. The record does not disclose the respective ownership shares of WIS and petitioner in this vehicle. We estimate petitioner's share as one-half; accordingly, petitioner is entitled to have one-half of the proceeds from the sale of this vehicle applied to his basis in WIS. See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930); Rudd v. Commissioner, 79 T.C. 225, 236-238 (1982).

At trial, respondent's counsel asserted that since the income tax returns of WIS showed that the corporation had claimed depreciation with respect to three of the five vehicles prior to the sale, it was respondent's position that WIS was the owner of these three vehicles for tax purposes, regardless of who held title. However, WIS's tax returns were not introduced in evidence, and petitioner's testimony contradicted counsel's

assertions. Accordingly, petitioner is entitled to an additional $20,515 of basis in WIS for 1990, corresponding to the sum of the sale prices of the two Toyota pickups, the Toyota Cressida, and the Ford Bronco as well as one-half the sale price of the Ford Aerostar.

There is no persuasive evidence of any further investments in WIS by petitioner before or during the years at issue. Although petitioners did introduce personal credit card statements reflecting cash advances in the total amount of $7,300 during 1990, there is no evidence in the record that any of these advances were used on behalf of WIS rather than for petitioner's personal consumption. For this reason respondent properly denied petitioner basis credit for any portion of this amount. Petitioners also introduced deposit slips evidencing three deposits into WIS's account at Palmetto Federal during 1990 in the total amount of $2,250. The deposit slips identify the amounts as loans. However, petitioners failed to prove that petitioner was the source of the loans.

Petitioners urge the Court, in the absence of direct evidence, to infer that petitioner's investment in WIS was sufficient to deduct the full amount of the losses claimed on their individual returns. First, they argue that, although petitioner possessed documentation necessary to substantiate the amount of his basis in WIS, the revenue agents neglected to request it. Three months before trial, in August 1995, "since

- 14 -

the audit was over and no one had asked any questions, it was ASSUMED that the files and records were no longer needed, they were destroyed."  If there is insufficient evidence in the trial record to establish the amount of petitioner's basis, they argue, the perfunctory handling of the audit is to blame, and it would be unfair to make petitioners bear the consequences.  "In a criminal proceedings [sic] had the investigators failed to complete the investigation * * * ruling in favor of the defendant would be appropriate."

Petitioners misunderstand the nature of this proceeding.  A petition for redetermination of a deficiency is a request for a trial on a clean slate of all disputed issues relating to the taxpayer's liability for the taxable year.  The factual record assembled at the audit stage as a basis for the Commissioner's determinations is generally irrelevant; unlike a criminal proceeding in which the Government bears the burden of persuasion, generally the Commissioner is not required to come forward with any evidence.  Potts, Davis & Co. v. Commissioner, 431 F.2d 1222, 1225 (9th Cir. 1970), affg. T.C. Memo. 1968-257; Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-328 (1974); Wisconsin Butter & Cheese Co. v. Commissioner, 10 B.T.A. 852, 854 (1928); Lyon v. Commissioner, 1 B.T.A. 378, 379-380 (1925).  Petitioners are not entitled to claim any more basis than they have proven with the few pertinent documents they retained and presented at trial.

Petitioners' second argument is that since petitioner was the sole shareholder of WIS, any loss sustained by WIS represented a loss of his investment. "It only makes sense that the losses had to come from somewhere and since TW was the only stockholder the losses had to come out of his pockets in some form". Considering the way in which petitioners computed these losses, the fallacy in their argument is obvious. The $136,748 loss they claimed on their 1991 return represented the excess of WIS's liabilities over its assets. This is precisely the extent to which the company's losses came out of the pockets of its creditors. In all likelihood, most of these losses were borne by third-party creditors. There is no necessary relationship between the extent of WIS's insolvency in 1991 and the amount of petitioner's investment loss.

Of the total proven investment of $98,015 as of the end of 1990, a deposit into WIS's bank account in February 1990 in the amount of $14,000 and a deposit into WIS's account in August 1990 in the amount of $15,000 are designated on the deposit slips as loans. Consequently, we are satisfied that as of the end of 1990 the basis of WIS's indebtedness to petitioner was $29,000 and the basis of petitioner's stock in WIS was $69,015.

2. Effect of Business Reincorporation Transaction on Petitioner's Basis in and Allowable Losses Respecting SPS

Petitioners contend that petitioner acquired an initial basis in SPS stock of $34,309. This amount represents the sum of

$5,000 cash, $18,509 accounts receivable, and work in process valued at $10,800, which they claim were transferred by WIS to SPS at the time of SPS's formation. There is adequate evidence in the record to confirm that WIS transferred $23,509 of cash and accounts receivable to SPS in December 1991, and transferred an additional $7,138 of accounts receivable at the beginning of 1992, for a total investment of $30,647.

Petitioners claim the total value of the WIS contribution to SPS as the basis of petitioner's SPS stock, on the ground that his wholly owned corporation was the source of all property contributed and the contributions were made on his behalf. Respondent, on the other hand, contends that petitioner acquired no basis in SPS by reason of any transfers from WIS. Although respondent does not articulate the legal theory behind this position, the reason respondent gives is that petitioner failed to demonstrate that he had any remaining basis in WIS at the times of the alleged transfers from WIS to SPS.

Based largely on petitioner's uncontroverted testimony, the salient facts of the business reincorporation transaction may be summarized as follows: All the stock of SPS was issued in 1992 in exchange for property transferred by WIS during December 1991 and January 1992; petitioner's business associates, Lewis and Tate, received two-thirds of SPS's stock; the transfers of property by WIS to SPS were made on petitioner's behalf and not made in satisfaction of any liabilities of WIS to Lewis and Tate.

Petitioner granted Lewis and Tate an ownership interest in SPS as an inducement to assist petitioner in managing the business.

For tax purposes, the transaction structure implied by the facts consists of three steps: (1) The transfers of assets by WIS to SPS in exchange for SPS stock; (2) the distribution by WIS of SPS stock to petitioner;[5] and (3) the transfer by petitioner to Lewis and Tate of two-thirds of the SPS stock in consideration of their agreement to render services to SPS. Petitioner's basis in the one-third of the SPS stock he retained depends upon whether he received the stock in a distribution governed by section 301 or, pursuant to a reorganization, in a distribution governed by section 354 or 355. If steps 1 and 2 constituted a reorganization, then petitioner's basis in the SPS stock distributed to him would be determined under section 358 by reference to his basis in WIS stock. If steps 1 and 2 did not constitute a reorganization, then petitioner's basis in the SPS stock distributed to him would be equal to the fair market value of the stock under section 301(d). In either case, petitioner's disposition of two-thirds of the SPS stock in step 3 did not

---

[5] Since the parties agree that both WIS and SPS were S corporations for all taxable years at issue, there is no need to consider what effect, if any, WIS's transitory ownership of SPS stock in the course of the business reincorporation transaction would have had on each corporation's eligibility for S corporation status. See secs. 1361(b)(1)(B), (2)(A), (c)(6), 1362(d)(2), (f); see also Haley Bros. Constr. Corp. v. Commissioner, 87 T.C. 498, 516-517 (1986); Rev. Rul. 72-320, 1972-1 C.B. 270.

reduce his aggregate stock basis, since the basis of the shares he transferred is added to the basis of the shares he retained, in accordance with the treatment of his transfer of the shares as a contribution to the capital of SPS.[6]

We are satisfied that the business reincorporation transaction did not qualify as a reorganization for income tax purposes. Since WIS did not transfer substantially all of its assets to SPS and distribute all of its remaining properties, the transaction does not satisfy the requirements of a C reorganization or an acquisitive D or G reorganization. Secs. 368(a)(1)(C), (D), (G), (2)(G), 354(b). Since WIS ceased active business following the formation of SPS, the requirements of a divisive D or G reorganization are not satisfied. Secs. 368(a)(1)(D), (G), 355(b)(1). As a result, petitioner did not receive the stock of SPS in an exchange to which either section 354 or

---

[6] If a shareholder of a corporation transfers stock to a corporate employee in consideration of the performance of services for the corporation, the shareholder is treated as having contributed the stock to the capital of the corporation and the corporation is treated as having transferred the stock to the employee immediately thereafter. Tilford v. Commissioner, 705 F.2d 828 (6th Cir. 1983), revg. 75 T.C. 134 (1980); Estate of Foster v. Commissioner, 9 T.C. 930, 936 (1947); Webb v. United States, 560 F. Supp. 150, 155, 157 (S.D. Miss. 1982); sec. 1.83-6(d)(1), Income Tax Regs.; see Commissioner v. Fink, 483 U.S. 89, 98 n.14 (1987); Frantz v. Commissioner, 83 T.C. 162, 174-181 (1984), affd. 784 F.2d 119 (2d Cir. 1986). The shareholder's basis in the transferred shares is reallocated to the shares he retains. Estate of Foster v. Commissioner, supra; sec. 1016(a)(1); sec. 1.263(a)-2(f), Income Tax Regs. Cf. Rev. Rul. 80-76, 1980-1 C.B. 15.

355 applies, and therefore he did not take an exchanged basis in that stock pursuant to section 358. Sec. 358(a)(1), (c); see sec. 7701(a)(44). It therefore follows that petitioner received the SPS stock in a distribution governed by section 301, at a basis equal to the fair market value of the stock. Sec. 301(d).

On the limited record before us, we conclude that the fair market value of SPS's issued capital stock was equal to the value of the net assets transferred to SPS in the exchange, viz, $30,647. See United States v. Davis, 370 U.S. 65, 72 (1962); Philadelphia Park Amusement Co. v. United States, 130 Ct. Cl. 166, 126 F. Supp. 184, 189 (1954). Although the most important asset of SPS would have been the "human capital" that petitioner and his associates brought to the business, and although the inauspicious circumstances under which SPS was organized might well have raised doubts about its ultimate success, the effect of these factors upon the value of the corporation's stock cannot be determined from the record. Therefore, petitioner's initial basis in the portion of the SPS stock he retained was $30,647.[7]

---

[7] We observe that the tax results to petitioner of our determination of the value of SPS stock received by him would be the same if we determined that value to be zero or some other figure. This is because the amount includable in petitioner's income as a result of his receipt of the SPS stock would in all likelihood exactly equal his additional basis in the stock for the purpose of computing his share of the allowable loss incurred by SPS for 1992. See text infra pp. 20-21.

In the notice of deficiency respondent allowed petitioner a loss attributable to SPS in the amount of $879 for 1992. This determination necessarily implies that petitioner acquired at least $879 of basis in his stock of or loans to SPS during that year. Neither the record nor the arguments on brief disclose how this amount was determined. However, in view of the position taken by respondent during these proceedings that petitioner acquired no basis in SPS as a result of transfers of property from WIS pursuant to the business reincorporation transaction, we construe the determination in the notice of deficiency as a concession that petitioner made an additional investment of $879 at some time during 1992 in an unrelated transaction. Consequently, by the close of 1992, petitioner's combined basis in SPS stock and debt was $31,526, before taking account of pass-through losses for the year.

The transfer by WIS of cash and accounts receivable to SPS during December 1991 and January 1992 in exchange for all of SPS's stock constituted a transaction described in section 351. Sec. 351(a), (c). Neither corporation recognized gain on the exchange, and WIS took a basis in the SPS stock equal to the sum of its bases in the cash and accounts receivable. Sec. 358(a)(1). As a cash method taxpayer, WIS had no basis in the unrealized receivables. Consequently, its exchanged basis in the SPS stock preserved the unrealized gain in respect of the receivables for later taxation. On the distribution of the SPS

stock to petitioner upon its receipt in 1992, WIS recognized this built-in gain in full.  Sec. 311(b).  Since the character of the gain is ordinary, it is taken into account in determining WIS's nonseparately computed loss for 1992.  Secs. 1221(4), 1366(a).

The amount of WIS's nonseparately computed loss for 1991 greatly exceeded petitioner's basis in WIS stock.  As a result, on the distribution of the SPS stock to him at the beginning of 1992, petitioner had no remaining basis in WIS stock and recognized capital gain to the full extent of the amount of the distribution.  Secs. 1367(a)(2), 1368(b)(2).  The amount of the distribution, and the gain recognized to petitioner, was the fair market value of the SPS stock distributed, viz, $30,647.  Secs. 301(b)(1), 1371(a)(1).  This income fully offsets the pass-through losses from SPS to which petitioner is entitled for 1992 by reason of the investment made in SPS pursuant to the business reincorporation transaction.

Based on the foregoing analysis, we redetermine the adjustments to petitioners' income attributable to WIS and SPS as follows:

Taxable Year 1990

Adjustments Attributable to WIS

| | |
|---|---|
| Total of bases in WIS stock and debt (investment basis) | $98,015 |
| WIS loss per return | 65,169 |
| Pass-through loss allowed per notice of deficiency | 65,169 |
| Investment basis after pass-through adjustment | 32,846 |

Taxable Year 1991

Adjustments Attributable to WIS

| | |
|---|---:|
| Investment basis | 32,846 |
| WIS income per return | 1,541 |
| WIS "other losses" per return | 136,748 |
| WIS nonseparately computed loss (as conceded by respondent) | 135,207 |
| Pass-through loss allowable | 32,846 |
| Pass-through loss suspended | 102,361 |
| Investment basis after pass-through adjustment | - 0 - |

- - - - - -

| | |
|---|---:|
| Loss allowable | 32,846 |
| Loss allowed per notice of deficiency | 12,331 |
| Reduction in taxable income | 20,515 |

Taxable Year 1992

1.  Adjustments Attributable to WIS

| | |
|---|---:|
| Investment basis | - 0 - |
| WIS income per return | 6,777 |
| WIS gain on distribution | 25,647 |
| WIS suspended loss treated as incurred in 1992 | 102,361 |
| WIS nonseparately computed loss | 69,937 |
| Pass-through loss allowable | - 0 - |
| Pass-through loss suspended | 69,937 |
| Investment basis after pass-through adjustment | - 0 - |
| Petitioner's gain on excess distribution | 30,647 |

2.  Adjustments Attributable to SPS

| | |
|---|---:|
| Investment basis | 31,526 |
| Allocable share of SPS loss per return | 40,560 |
| Allocable share of SPS nonseparately computed loss (as conceded by respondent) | 40,560 |
| Pass-through loss allowable (as conceded by respondent) | 31,526 |
| Pass-through loss suspended | 9,034 |
| Investment basis after pass-through adjustment | - 0 - |

- - - - - -

| | |
|---|---:|
| Net loss allowable (31,526- 30,647) | 879 |
| Loss allowed per notice of deficiency | 879 |
| Additional loss allowable | - 0 - |

Taxable Year 1993

Since the foregoing computations confirm respondent's determination that petitioner had no investment basis remaining in SPS after the pass-through adjustments for 1992, we sustain respondent's disallowance of the $36,464 deduction claimed for petitioner's share of losses attributable to SPS for 1993.

3. Conclusion

We have concluded that petitioners' taxable income for 1991 was $20,515 lower than the amount determined by respondent. Petitioners are entitled to the resulting reduction of the deficiency for that year, to be determined in a Rule 155 computation.

Petitioners have not persuaded us that the deficiency determinations for 1992 and 1993 are erroneous. Neither party provided a coherent analysis of the tax consequences of the business reincorporation transaction: Respondent's position seems to be either that there was in fact no such transaction or that it had no effect on petitioners' tax liability; petitioners contended that the transaction created basis in petitioner's SPS stock, but did not acknowledge the tax cost of acquiring that basis. Consequently, in sustaining respondent's determinations for 1992 and 1993, we have necessarily relied upon a legal analysis that was neither pleaded nor argued by the parties.

A deficiency determination may be sustained upon any legal ground that supports it, even though the grounds relied upon by

the Commissioner may have been different or unsound.  Blansett v.
United States, 283 F.2d 474, 478 (8th Cir. 1960); Smith v.
Commissioner, 56 T.C. 263, 291 n.17 (1971); Wilkes-Barre Carriage
Co. v. Commissioner, 39 T.C. 839, 845-846 (1963), affd. 332 F.2d
421 (2d Cir. 1964).

> It is the Court's right and obligation to decide the
> case upon what it considers to be the correct
> application of the law, based upon the record
> presented, whether the parties have properly pleaded
> the controlling issues or not.  * * * if the Court
> feels that a full and fair opportunity to present the
> facts has been given, and the Court feels that no
> further briefing on the law is necessary, the Court can
> go forward and decide the case on the record presented.
> [Barnette v. Commissioner, T.C. Memo. 1992-595, affd.
> without published opinion sub nom. Allied Management
> Corp. v. Commissioner, 41 F.3d 667 (11th Cir. 1994).]

There is no reason to believe that petitioners have been
prejudiced by our resolution of the case.  Considering
petitioners' evidentiary showing at trial and arguments on brief,
we are satisfied that they had sufficient opportunity to prove
the relevant facts and would not have presented their case any
differently, even if they had been fully and correctly advised by
the notice of deficiency or respondent's pleadings of the
intricate and interrelated provisions of the Code that govern the
tax consequences of the business reincorporation transaction.

To reflect the foregoing,

Decision will be entered

under Rule 155.